# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Walter Barry, et al.,

|  | | |
|---|---|---|
| | Plaintiffs, | Case No. 13-cv-13185 |
| | | Hon. Judith E. Levy |
| v. | | |
| Maura Corrigan, | | |
| | Defendant. | |

_____/

## OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S [81] MOTION TO DISMISS AND / OR FOR SUMMARY JUDGMENT, GRANTING PLAINTIFFS' [39] AMENDED MOTION TO CERTIFY CLASS, AND GRANTING PLAINTIFFS' [49] MOTION FOR SUMMARY JUDGMENT

Plaintiffs bring this suit as a class action against defendant Maura Corrigan, in her official capacity as Director of the Michigan Department of Human Services (hereinafter "DHS"), challenging Michigan's law and policy governing disqualification of "fugitive felons" from various forms of public assistance, including federal food assistance. Under that law and policy, defendant disqualifies applicants and recipients of federally-funded public assistance benefits

based on a match between the applicant's / recipient's name and a record of an outstanding felony warrant in the Michigan Law Enforcement Information Network (hereinafter "LEIN"). Defendant informs persons of their disqualification by means of a written notice. Plaintiffs challenge that notice as failing to provide the due process of law required by the Fourteenth Amendment to the United States Constitution and as failing to meet the notice requirements of the Food and Nutrition Act, as amended, 7 U.S.C § 2011 *et seq*. Plaintiffs also contend the Michigan law and DHS policy themselves violate and are preempted by the Act.

Before the Court are defendant's Motion to Dismiss or for Summary Judgment (Dkt. 81), plaintiffs' Amended Motion to Certify Class (Dkt. 39), and plaintiffs' Motion for Summary Judgment (Dkt. 49). For the reasons set forth below, the Court will grant defendant's Motion to Dismiss with respect to defendant Woodward only, and deny defendant's motion with respect to the remainder of the relief sought; grant plaintiffs' Motion to Certify Class; and grant plaintiffs' Motion for Summary Judgment.

2

## I.    Factual background

Congress first established a permanent Food Stamp Program in 1964.  Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 (1964).  The purpose of the program was "to promote the general welfare" and "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households."  *Id.* § 2.  Congress made significant revisions to the program in 1977.   Food Stamp Act of 1977, Pub. L. No. 95-113, 91 Stat. 913 (1977).  In 2008, the Food Stamp Program was renamed the "Supplemental Nutrition Assistance Program" (hereinafter "SNAP") and the Food Stamp Act was renamed the Food and Nutrition Act of  2008 (hereinafter "SNAP Act").[1]  Food and Nutrition Act of 2008, Pub. L. No. 110-234, 122 Stat. 1092 (2008).

SNAP is administered through state programs, although the benefits are funded by the federal government.  7 U.S.C. §§ 2013, 2020(a), (d), (e).  The state programs are governed by criteria set forth in the SNAP Act.  Those criteria include the standards for qualification for and disqualification from SNAP benefits.  7 U.S.C. §§ 2014-2015.

---

[1] The parties have referred throughout this case to the Food and Nutrition Act as the "SNAP Act."  The Court will do likewise to avoid confusion.

The eligibility standards in state plans must be "in accordance with sections 2014 and 2015 of [the SNAP Act] and "include no additional requirements imposed by the State agency." *Id.* § 2020(e)(5). States are expressly prohibited from imposing "any other standards of eligibility as a condition for participating in the program," *Id.* § 2014(b).

Of relevance here, section 2015(k) provides that:

> No member of a household who is otherwise eligible to participate in the supplemental nutrition assistance program shall be eligible to participate in the program as a member of that or any other household during any period during which the individual is--
>
> > (A) fleeing to avoid prosecution, or custody or confinement after conviction, under the law of the place from which the individual is fleeing, for a crime, or attempt to commit a crime, that is a felony under the law of the place from which the individual is fleeing or that, in the case of New Jersey, is a high misdemeanor under the law of New Jersey; or
> >
> > (B) violating a condition of probation or parole imposed under a Federal or State law.

7 U.S.C. § 2015(k)(1).

Michigan's SNAP program, titled Food Assistance Program (hereinafter "FAP"), is administered by DHS. DHS also administers

other public assistance programs, including the Family Independence Program, State Disability Assistance Program, Child Day Care Program, and Refugee Assistance Program.

Since October 8, 2011, Michigan's Social Welfare Act prohibits DHS from granting public assistance benefits to any person who is "subject to arrest under an outstanding warrant arising from a felony charge against that individual in this or any other jurisdiction." 2011 P.A. 198, codified at Mich. Comp. Laws § 400.10b. The Act also requires DHS and Michigan State Police (hereinafter "MSP") to develop an automated program that compares DHS' list of public assistance recipients with MSP's information regarding outstanding felony warrants or extradition warrants. Mich. Comp. Laws § 400.10c. That program, dubbed the "fugitive felon interface," has been operational since January 2013. (Dkt. 49-2 & 49-3, Ex. A & B to Pls.' Mot. Summ. J.)

DHS' computer eligibility system is known as "Bridges." Pursuant to the policies set forth in its Bridges Eligibility and Bridges Administrative Manuals [hereinafter "BEM" and "BAM"], DHS disqualifies persons from food assistance benefits who are (1) subject to

arrest under an outstanding warrant arising from a felony charge, (2) subject to arrest under an outstanding warrant for extradition arising from a criminal charge, or (3) admitted fugitive felons.  (Dkt. 49-5 & 49-6, Exs. D & E to Pls.' Mot. Summ. J. (BEM 204); Dkt. 49-7 & 49-8, Ex. F & G to Pls.' Mot. Summ. J. (BEM 203).)   Bridges automatically identifies matches between the DHS benefit list and the MSP warrant information.  Bridges then sets the benefit applicant's / recipient's file to close, generates a criminal justice disqualification notice that is sent to the applicant / recipient, and automatically schedules the reduction or termination of benefits.  (Dkt. 49-14, Ex. M to Pls.' Mot. Summ. J. (BAM 811, eff. 2/1/13); Dkt. 49-15, Ex. N to Pls.' Mot. Summ. J. (BAM 811, eff. 5/1/13); Dkt. 49-16, Ex. O to Pls.' Mot. Summ. J. (BAM 811, eff. 7/1/13); Dkt. 49-17, Ex. P to Pls.' Mot. Summ. J. 2-3.)

The individual plaintiffs in this case are Walter Barry, Heather Woodward, Donitha Copeland, Kenneth Anderson, and Westside Mothers, a non-profit organization with 450-500 dues-paying members that advocates on behalf of public assistance applicants and recipients. Barry, Woodward, Copeland, and Anderson have all received at least one criminal justice disqualification notice and have been threatened

with reduction or termination of food assistance benefits, or have experienced actual reduction or termination of benefits, based on the criminal justice disqualification.

Plaintiffs bring four counts in their Second Amended Complaint (Dkt. 70). Counts I, II, and III are brought pursuant to 42 U.S.C. § 1983:

- **Count I**: **Denial of due process under the Fourteenth Amendment.** Plaintiffs allege defendant's criminal justice disqualification notices violate plaintiffs' constitutional rights to adequate notice and a meaningful opportunity to be heard, before denial / reduction / termination of public assistance benefits, as a matter of constitutional law.

- **Count II**: **Denial of due process under the Supplemental Nutritional Assistance Program Act ("SNAP Act"), 7 U.S.C. § 2020(e)(10)**. Plaintiffs allege the criminal justice disqualification notices violate plaintiffs' rights to adequate notice and a meaningful opportunity to be heard before denial / reduction / termination of public assistance benefits, as a matter of statutory law.

- **Count III: Violation of rights to receive food assistance under the SNAP Act, 7 U.S.C. §§ 2014(a) and (b) and 2020(e)(5)**. Plaintiffs allege Mich. Comp. Laws 400.10b, as well as defendant's policies enacted pursuant to that law, violate plaintiffs' federal statutory right to food assistance benefits.

7

- **<u>Count IV</u>: Preemption of Mich. Comp. Laws § 400.10b and defendant's fugitive felon policy by the SNAP Act, 7 U.S.C. §§ 2014(b), 2015(k), and 2020(e)(5).** Plaintiffs allege the SNAP Act expressly preempts Mich. Comp. Laws 400.10b and defendant's fugitive felon policy and practices.

The Court will begin its analysis with the issues of whether plaintiffs have standing to bring this suit and whether their claims are moot. The Court will then address plaintiffs' motion for class certification and the remaining issues in the parties' cross-motions for summary judgment.

## II.    Standing / mootness

Defendant argues for dismissal of all plaintiffs' claims for lack of standing. Defendant further maintains that the claims of plaintiffs Barry, Woodward, and Copeland (and therefore, Westside Mothers) are moot, and should therefore be dismissed. (Dkt. 75, Def.'s Resp. to Pls.' Mot. Summ. J. xi.)

### A.    Standing

It is an "essential and unchanging part of the case-or-controversy requirement of Article III" that a plaintiff must have standing to bring a case in federal court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992).  Constitutional standing doctrine requires a plaintiff to show (1) a "concrete, particularized, and actual or imminent" injury, that is (2) "fairly traceable" to the defendant's conduct, and is (3) "likely" to be "redressed by a favorable decision."  *Defenders of Wildlife*, 504 U.S. at 560-61.  An association has standing "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000).  The plaintiff bears the burden of establishing these elements.  *Defenders of Wildlife*, 504 U.S. at 561.

The relevant time for determining standing is the outset of the litigation.  *See Laidlaw*, 528 U.S. at 189 (defining standing as "the requisite personal interest that must exist at the commencement of the litigation" (citations and internal quotation marks omitted)).  But the elements of standing must be supported throughout the litigation.  *Defenders of Wildlife*, 504 U.S. at 561.  Thus, "[a]t the pleading stage, general factual allegations of injury resulting from defendant's conduct may suffice."  *Id*.  But at the summary judgment stage, the plaintiff

9

must "set forth by affidavit or other evidence specific facts" supporting the existence of an injury in fact. *Id.*

Defendant argues that the individual plaintiffs cannot show the first element of standing – injury in fact. Westside Mothers thus cannot show the first element of associational standing, as its only member among the individual plaintiffs, Copeland, lacks standing herself.

When, as here, "the suit is one challenging the legality of government action or inaction" and the plaintiff is the "object of the action," then "there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it." *Defenders of Wildlife*, 504 U.S. at 561-62. Indeed, the individual plaintiffs here were the objects of the two actions they challenge: notice of disqualification from public assistance benefits, and disqualification from food assistance benefits. All four individual plaintiffs assert the same two injuries: (1) procedural injury, from defendant's allegedly inadequate notices, and (2) economic injury, in the form of actual or threatened loss of food assistance benefits, from defendant's automatic felon disqualification policy. (Dkt. 85, Pls.' Resp. 1.) Plaintiff Westside Mothers asserts standing based on economic

injury: namely, that its members' ability to pay dues is directly affected by their loss of food assistance under defendant's challenged policies. (Dkt. 70, Second Amended Compl. ¶¶ 200-201.)  Westside Mothers also claims associational standing through plaintiff Copeland.

1. <u>Barry</u>

Plaintiff Barry filed the initial class action complaint in this matter on July 25, 2013.  (Dkt. 1.) At that time, he had an outstanding felony warrant in his name, and a disqualification from food assistance that went into effect on June 1, 2013.  (Dkt. 50-2, Ex. S to Pls.' Mot. Summ. J.)  Barry did not receive his July food assistance until July 26, 2013 – two days after he filed the complaint, and one day after he moved for class certification.  (Dkt. 70-10, Ex. I to Second Amended Compl.)  At the time he brought his claim, Barry suffered several injuries in fact: a procedural injury, from the allegedly inadequate notice, and economic injuries, consisting of defendant's withholding of his July 2013 food assistance, the threat of having to repay those benefits, once received, if he lost at the hearing on his disqualification, and the threatened termination of all future benefits.  Barry thus had standing to bring the claims in this suit.

11

Defendant maintains Barry lacks standing because he has suffered no injury in fact. (Dkt. 81, Def.'s Br. in Support of Mot. to Dismiss 1.) Defendant apparently means that because Barry has received food assistance "every month since June 1, 2013," he has suffered no injury. (*See* Dkt. 75, Def.'s Resp. to Pls.' Mot. Summ. J. 1.) But defendant fails to counter evidence that (1) Barry's food assistance had been withheld at the time he filed the complaint, (2) Barry's disqualification had not been resolved at the time he filed the complaint, leaving him exposed to the possibility of having to repay benefits and to termination of future benefits, and (3) Barry suffered a procedural injury from defendant's notice.

### 2.   Woodward

Woodward applied for food assistance in July 2013 and received a denial notice, based on a criminal justice disqualification, on August 1, 2013. (Dkt. 50-8, Ex. Y to Pls.' Mot. Summ. J.) Woodward joined this action in the Amended Complaint filed on August 13, 2013. (Dkt. 7.) At that time, Woodward remained disqualified from receiving food assistance. She therefore has established an injury in fact (both the

procedural injury from the notice and the economic injury from the disqualification) and has standing to bring this suit.

Defendant argues that Woodward lacks standing because (1) she was denied food assistance as an applicant, not a recipient, of benefits, and (2) she currently receives food assistance benefits. (Dkt. 75, Def.'s Resp. to Pls.' Mot. Summ. J. 3.) But neither argument bears on standing: the first goes to Woodward's adequacy as a class representative, while the second goes to mootness (see below).

3.   Copeland

Copeland applied and was approved for food assistance in September 2012. (Dkt. 70, Second Amended Compl. ¶¶ 137-38.) She received a criminal justice disqualification notice dated December 31, 2012, terminating her food assistance effective February 1, 2013. (Dkt. 70-21, Ex. T to Second Amended Compl.) Copeland reapplied and received a notice dated February 12, 2013, denying benefits based on a criminal justice disqualification. (Dkt. 70-22, Ex. U to Second Amended Compl.) Plaintiffs moved to amend their complaint and motion for class certification on October 28, 2013, adding Copeland to both. (Dkt. 38.)

At that time, Copeland still had an outstanding felony warrant and remained disqualified from receiving food assistance benefits. She therefore has established procedural and economic injuries, and has standing to bring her claims.

Defendant argues that Copeland lacks standing because she (1) failed to request an administrative hearing, and (2) has moved out of state. (Dkt. 75, Def.'s Resp. to Pls.' Mot. Summ. J. 3.) The only authority defendant provides for the proposition that Copeland had to exhaust her state administrative remedies in order to have standing to bring this suit is an unpublished order denying a petition for a writ of habeas corpus. (*See* Dkt. 75-4, Ex. 3 to Def.'s Resp. to Pls.' Mot. Summ. J.) Defendant does not explain, nor can the Court discern, why this case is relevant. In fact, as explained below, there is a strong presumption against requiring a plaintiff to exhaust state remedies before bringing a suit pursuant to 42 U.S.C. § 1983. *Patsy v. Bd. of Regents of State of Florida*, 457 U.S. 496, 516 (1982). Copeland's failure to request a state administrative hearing on her disqualification does not preclude her from bringing this suit. As for Copeland's relocation to Alaska, that argument goes to mootness, not standing.

14

4.   <u>Anderson</u>

It is undisputed that Anderson still has an outstanding felony warrant in his name and is not receiving food assistance benefits. Defendant only argues that Anderson lacks standing based on Anderson's failure to exhaust state administrative remedies. (Dkt. 75, Def.'s Resp. to Pls.' Mot. Summ. J. 3.) As with Copeland, Anderson's failure to request a state administrative hearing does not affect his standing to bring this action.

5.   <u>Westside Mothers</u>

Because Copeland had standing at the time Westside Mothers joined the case, Westside Mothers has associational standing.

The case for Westside Mothers' independent standing, however, is more difficult, and turns on an element of standing not addressed by the parties: redressability. Westside Mothers has met the injury element by asserting economic injury in the form of lost dues payments from members. However, when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else . . . causation and redressability ordinarily hinge on the

response of the regulated (or regulable) third party to the government action or inaction." *Defenders of Wildlife*, 504 U.S. at 562.  In such circumstances, standing "is ordinarily substantially more difficult to establish." *Id*.

Here, a decision in favor of plaintiffs would plausibly lead to some members of Westside Mothers receiving food assistance benefits.  As a result, those members could reasonably be expected to have more money to spend on other, non-food expenses.  But the alleged economic injury to Westside Mothers can only be remedied if those members decide to spend a portion of that money as dues.  That is, the redressability of Westside Mothers' economic injury depends on decisions beyond the Court's control.  While the scenario here is not precisely analogous to that in *Defenders of Wildlife* – where redressability hinged on the decisions of third parties not before the Court – it is close enough to require more from Westside Mothers to show it meets the redressability element of standing.  The Court therefore finds that Westside Mothers has associational, but not independent, standing to bring this action.

## B.   Mootness

16

Courts have often described mootness as "the doctrine of standing set in a time frame." *Laidlaw*, 528 U.S. at 189. On this view, the relationship between standing and mootness is as follows: "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Id.* If the plaintiff's personal interest, or "stake in the outcome of the lawsuit," is eliminated during the litigation, "the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1528 (2013).

There are recognized exceptions to the mootness doctrine, including the exception, invoked here by plaintiffs, for claims that are "capable of repetition yet evading review." *See Laidlaw*, 528 U.S. at 191. This exception applies "when (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subject to the same action again." *Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2004). The party asserting that this exception applies has the burden of establishing both elements. *Id.* But it is not necessary to show that "recurrence of the

17

dispute [is] more probable than not," only that "the controversy [is] *capable* of repetition." *Honig v. Doe*, 484 U.S. 305, 319 n.6 (1988).

1.   Barry

Defendant argues Barry's claims are moot because "there is no Department action against his food assistance, he no longer has a felony warrant in his name and he is receiving benefits." (Dkt. 81, Def.'s Br. in Support of Mot. to Dismiss 6.)   While it is undisputed that Barry is receiving benefits, it also appears undisputed that he has a second outstanding felony warrant in his name.   (Dkt. 79-8, Ex. G to Pls.' Reply in Support of Mot. Summ. J.; Dkt. 86, Def.'s Sur-reply to Amended Mot. Cert. Class 4, 6.)   At the hearing on these motions, defendant's counsel stated that defendant had been advised by email that all of Barry's warrants had been resolved.   Defendant has not, however, proffered the email or any other evidence that Barry's second warrant has, in fact, been resolved.   Barry's claims are therefore not moot – there is a reasonable expectation that he will be again subject to defendant's criminal disqualification policy and notice.

2.   Woodward

Defendant maintains that Woodward's claims have become moot, because she "no longer appears as a fugitive felon" and receives food assistance benefits.  (Dkt. 81, Def.'s Mot. to Dismiss 6.)  In support, defendant points to the affidavit of Dale Shaw, a Cash Assistance Senior Policy Analyst at DHS.  (Dkt. 74-2, Ex. 1 to Def.'s Resp. to Pls.' Amended Mot. Cert. Class [hereinafter "Shaw Aff."])  Shaw states that Woodward "is not currently listed as a fugitive felon."  (*Id.*)  He further states that Woodward applied for food assistance on August 11, 2014. (*Id.*)  On that same day, "[i]t appears the caseworker changed her FF [*sc.* fugitive felon] status from yes to no," but "there are no notes . . . as to whether the caseworker verified that she had resolved her FF status."   Woodward was approved for food assistance benefits on September 4, 2014.  (*Id.*)

Woodward's outstanding felony warrant was apparently related to her alleged theft of exercise equipment from her father's house.  While her father has submitted a declaration stating that he does not wish to pursue charges against Woodward, and has advised police accordingly (Dkt. 52, Ex. YY to Pls.' Mot. Sum. J.), it is not clear from the record whether the warrant has, in fact, been resolved.

19

Plaintiffs do not, however, assert that Woodward still has an outstanding warrant. Rather, they maintain Woodward's claims are not moot based on her ongoing interest in receiving declaratory and notice relief that would allow her to recover food assistance benefits she lost while disqualified. (Dkt. 79, Pls.' Reply in Support of Mot. Class. Cert. 9).

Because Woodward is currently receiving food assistance benefits and is not at risk of disqualification based on an outstanding felony warrant, she no longer has a personal stake in the injunctive relief sought by plaintiffs. Under *Green v. Mansour*, declaratory relief against a state runs afoul of the Eleventh Amendment in the absence of a continuing or threatened violation of federal law. 474 U.S. 64, 73 (1985). And the notice relief sought by plaintiffs cannot stand on its own, but only "escape[s] the Eleventh Amendment bar" if it is ancillary to another type of relief. *Green*, 474 U.S. at 71. Given, then, that neither declaratory nor notice relief would be available to Woodward, her alleged interest in such relief cannot keep her claims alive in this case. Woodward's claims are therefore moot.

    3.   <u>Copeland and Westside Mothers</u>

Defendant maintains Copeland's claims are moot because she no longer has an outstanding felony warrant and has moved to Alaska. (Dkt. 81, Defs.' Mot. to Dismiss 6.)   Plaintiffs counter there is a reasonable expectation that Copeland will be again subject to disqualification (and notice thereof), because (1) her warrant was dismissed without prejudice, (2) that warrant was the result of someone stealing Copeland's identity, and that person could commit further crimes using Copeland's identity, and (3) Copeland will return to Michigan in November 2014.

Whether Copeland's claims are moot is a close question.  Copeland has submitted a declaration in which she states that she moved to Alaska for seasonal employment and intends to return to Michigan thereafter.  (Dkt. 83, Ex. E to Pls.' Reply in Support of Mot. Summ. J., Second Copeland Dec. ¶ 2 [hereinafter "Second Copeland Dec."].) Copeland notified DHS of her move to Alaska and expects to reapply for food assistance benefits upon her return to Michigan, as she does not have employment arranged in Michigan.  (*Id.* ¶¶ 4-5.)  On the basis of Copeland's declaration, the Court finds a reasonable expectation that

she will not be disqualified from receiving food assistance benefits on the basis of her residency.

Still, Copeland must show there is a reasonable expectation she will again be subject to defendant's fugitive felon disqualification policy. Again, she need not show it is more likely than not she will be subject to the disqualification policy. *Honig*, 484 U.S. at 319 n.6. Copeland raises the possibility that her felony warrant could be reinstated, and that her identity could again be used in the commission of a felony. The facts in Barry's case are certainly suggestive of the latter possibility: at least two felony warrants have issued in his name for acts he did not commit. Although it seems less likely that Copeland's warrant will be reinstated, the two possibilities together – of reinstatement of Copeland's felony warrant, and of a new warrant issuing in Copeland's name – are enough to create a reasonable expectation that Copeland "faces some likelihood of becoming involved in the same controversy in the future." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 398 (1980). Copeland's claims are therefore not moot. Because Copeland's claims are not moot, Westside Mothers' claims are similarly not moot.

22

4.   <u>Anderson</u>

Defendant does not challenge Anderson's claims as moot, and with good reason, as Anderson still has an outstanding felony warrant in his name and is not receiving food assistance benefits.

In sum, of the five named plaintiffs, only Woodward's claims are moot. Defendant's motion to dismiss thus cannot succeed on mootness grounds.

Even if the claims of <u>all</u> named plaintiffs were moot, this case would nonetheless survive defendant's motion under the "special mootness rules [that] exist for class actions." *Brunet v. City of Columbus*, 1 F.3d 390, 399 (6th Cir. 1993). It is well-established in this Circuit that mooting the named plaintiffs' claims while a motion for class certification is pending does not moot the case. *See Carroll v. United Compucred Collections, Inc.*, 399 F.3d 620, 625 (6th Cir. 2005); *Dozier v. Haverman*, No. 14-12455, 2014 U.S. Dist. LEXIS 153395, at *25-36 (E.D. Mich. Oct. 29, 2014) (thoroughly surveying relevant cases).

Here, plaintiffs Barry, Woodward, and Copeland joined in the motion for class certification before being approved for food assistance –

the act that defendant maintains mooted their claims.   Barry's food assistance benefits were reinstated the day after he filed his motion for class certification.   (Dkt. 70-10, Ex. I to Second Amended Compl.) Woodward joined the First Amended Class Action Complaint on August 13, 2013, and the proposed Amended Motion to Certify Class on October 28, 2013.  (Dkt. 7, 39.)  Her fugitive felon status was changed in DHS' records on August 11, 2014, and she was approved for food assistance benefits on September 4, 2014.  (Shaw Aff. ¶ 5.)  Copeland joined the proposed Second Amended Class Action Complaint and the Amended Motion to Certify Class on October 28, 2013.  (Dkt. 39, 40.)  Her felony warrant was dismissed without prejudice on November 19, 2013.  (Dkt. 79-9, Ex. H to Pls.' Reply Br. in Support of Mot. Cert. Class.) Copeland's food assistance benefits were approved thereafter.  (Dkt. 79, Pls.' Reply Br. in Support of Mot. Cert. Class 10.)

In short, defendant's attempts to moot the individual plaintiffs' claims, if they had been successful, would still not have prevented this case from going forward as a class action.

## III.  Motion to Certify Class

Having found that the individual plaintiffs have standing to bring their claims and that the claims of four individual plaintiffs are not moot, the Court must now determine whether class certification is warranted pursuant to Fed. R. Civ. P. 23.

## A.   Standard of Review

Plaintiffs bear the burden of affirmatively demonstrating that their proposed class meets all four requirements of Rule 23(a) and satisfies at least one provision of Rule 23(b). *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *Senter v. Gen'l Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976).  Rule 23(a) provides for class certification only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).    Plaintiffs maintain their proposed class falls within Rule 23(b)(2), which comprises actions in which "the party

opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23 further includes an "implicit requirement" that "an ascertainable class of persons to be represented" exists. *Dozier*, 2014 U.S. Dist. LEXIS 153395, at *37 (internal citation and quotation marks omitted). Failure to satisfy any of these requirements precludes certification. *Davis v. Cintas Corp.*, 717 F.3d 476, 484 (6th Cir. 2013).

"Meeting the requirements of Rule 23(a) requires something more than mere repetition of the rule's language; there must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012) (internal citation and quotation marks omitted). To that end, the Court must perform a "rigorous analysis," including, if necessary, "prob[ing] behind the pleadings before coming to rest on the certification question." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011).

## B.    Analysis

### 1.    <u>Ascertainability</u>

26

A threshold question in determining a motion for class certification is whether the defined class is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young*, 693 F.3d at 537-38. The Court must be able to make this determination by reference to objective criteria. *Id.*

Plaintiffs propose the following class, termed a "Due Process Class":

> [A]ll past, present, and future applicants for, or recipients of, benefits administered by the Michigan Department of Human Services (DHS) under the
>
> - Food Assistance Program (FAP)
> - Family Independence Program (FIP)
> - State Disability Assistance Program (SDA)
> - Child Day Care (CDC), and
> - Refugee Assistance Programs (RAP)
>
> public assistance programs, who have suffered or will suffer actual or threatened denial, termination, or reduction of public assistance benefits based on DHS' determination that the applicant / recipient or a member of the applicant / recipient's household is ineligible based on a criminal justice disqualification, and who do not receive a written notice, at the time of denial and at least 10 days prior to an actual or threatened termination or reduction, that details:

(i)   the nature and duration of the intended agency action,

(ii)   the specific actions they can take to lift the disqualification and fully access benefits, and

(iii)   the factual and legal reasons for the negative action, including

   a. which of the given types of criminal justice disqualifications is at issue,

   b. the name of the person whose alleged conduct has resulted in the disqualification,

   c. the date, place, and nature of the alleged crime and the resulting conviction or warrant,

   d. the jurisdiction where the conviction occurred or the warrant was issued,

   e. the name of a specific person or entity with knowledge of the basis for the disqualification whom the individual can contact for additional information,

   f. where applicable, the basis for concluding that the disqualified individual is aware that he or she is being sought by law enforcement and is fleeing to avoid prosecution, arrest, or custody or confinement for a felony, and

   g. where applicable, the basis for concluding that law enforcement is actively seeking the individual.

(Dkt. 39, Amended Mot. Class Cert. 2-3.)   Plaintiffs also propose the following subclass, termed "Automatic FAP Disqualification Subclass":

All past, present, and future applicants for, or recipients of, Michigan's Food Assistance Program benefits, who have suffered or will suffer actual or threatened denial, termination, or reduction of Food Assistance Program

28

benefits based on DHS's policy of disqualifying individuals as "fugitive felons," without a finding that the individual is intentionally fleeing from justice to avoid prosecution, or custody or confinement after conviction, and/or without finding that the individual is actively sought by law enforcement, for a crime that is a felony.

(*Id.* at 3-4.)

On plaintiffs' view, the proposed Due Process Class is ascertainable by reference to membership in a specific group (those having suffered denial, reduction, or termination of benefits based on a criminal justice disqualification), and to a specific harm (receipt of the allegedly inadequate criminal justice disqualification notice). (Dkt. 39, Pls.' Br. in Support of Mot. Class Cert. 3-4.) Likewise, the Automatic FAP Disqualification Subclass is ascertainable by reference to membership in a specific group (applicants for or recipients of food assistance benefits, who are alleged to have an outstanding felony warrant), and to a specific harm (denial, reduction, or termination of food assistance benefits without a determination that the person is fleeing or actively sought by law enforcement). (*Id.* at 13-14.)

Defendants respond that the proposed classes are not well-defined, because they include (1) people who have not been harmed, and

(2) both felons and non-felons.  (Dkt. 74, Def.'s Resp. to Mot. Class Cert. 5, 10.)  As with all of defendant's counterarguments, this depends on defendant's redefinition of plaintiffs' harm as "their erroneous disqualifications based on LEIN records of outstanding felony warrants."  (*Id.* at 5.)

The Court can find no reason why it should accept defendant's definition of plaintiffs' harm over plaintiffs' own definition.  The injuries plaintiffs allege – inadequate notice and disqualification without a determination that they are fleeing to avoid prosecution and are actively sought by law enforcement – are legally cognizable injuries. *See Carey v. Piphus*, 435 U.S. 247, 266-67 (1978) (holding "the denial of procedural due process should be actionable . . . without proof of actual injury); *Dozier*, 2014 U.S. Dist. LEXIS 153395, at \*66 (certifying class on basis of claims that (1) notice was inadequate under both Medicaid statute and Fourteenth Amendment and (2) defendant unlawfully terminated plaintiffs' Medicaid coverage without evaluating plaintiffs' eligibility for other Medicaid categories).

Furthermore, as plaintiffs note, what defendant terms the "real" harm – erroneous LEIN records – caused no harm to plaintiffs until

30

defendant used the LEIN records to disqualify plaintiffs from food assistance benefits. (Dkt. 79, Pls.' Reply in Support of Amended Mot. Class Cert. 4 n.6.) In other words, the question of whether the disqualification is lawful is different from the question of whether the LEIN records are accurate. (*See id.*) Accordingly, the Court rejects defendant's attempted redefinition of plaintiffs' harm and, along with it, defendant's primary argument against class certification.

While plaintiffs' proposed subclass satisfies the ascertainability requirement, their proposed class definition is problematic, in that it arguably implicates the merits on a central issue: the adequacy of defendant's disqualification notice. *See Dozier*, 2014 U.S. Dist. LEXIS 153395, at *41. By defining the class in terms of what was lacking from the notice, plaintiffs assume what a constitutionally and statutorily adequate notice should contain. The Court will therefore exercise its authority to *sua sponte* modify plaintiffs' proposed class definition. *See id.* at *39 (citing *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("[D]istrict courts have broad discretion to modify class definitions . . .")). Accordingly, the Court will evaluate the following class definition under Rule 23:

[A]ll past, present, and future applicants for, or recipients of, benefits administered by the Michigan Department of Human Services (DHS) under the

- Food Assistance Program (FAP)
- Family Independence Program (FIP)
- State Disability Assistance Program (SDA)
- Child Development and Care Program (CDC), and
- Refugee Assistance Program (RAP)

public assistance programs, who have suffered or will suffer actual or threatened denial, termination, or reduction of public assistance benefits based on DHS' determination that the applicant / recipient or a member of the applicant / recipient's household is ineligible based on a criminal justice disqualification, and who receive or have received a written notice at the time of denial issued by DHS informing the applicant / recipient of the criminal justice disqualification.

2.   <u>Numerosity</u>

Rule 23(a)(1) requires plaintiffs to demonstrate that the proposed class and subclass are so numerous that joinder of all members is impracticable.   While the number of potential class members is not dispositive, "the sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy [numerosity]."   Other factors to consider include "judicial economy, geographical dispersion of class members, ease of identifying putative class members, and practicality with which individual class

members could sue on their own." *Crawley v. Ahmed*, 2009 U.S. Dist. LEXIS 40794, at *28-29 (E.D. Mich. May 14, 2009).

Plaintiffs point to a Michigan State Police press release reporting 4,562 matches when MSP cross-checked names of persons with outstanding felony warrants against a list of DHS public assistance recipients.  (Dkt. 39-2, Ex. A to Pls.' Mot. Class Cert.)  These matches were only those made in January and February 2013.  On this basis, plaintiffs claim the class and subclass are so numerous that joinder will be impracticable.  Plaintiffs also note the likely geographical dispersion of class and subclass members (across Michigan), the difficulty they face in bringing suit on their own (given their likely low-income status), and the ease of identifying them through DHS databases.

Defendant counters by again redefining the harm as erroneous disqualification based on an outstanding felony warrant.  Based on that definition, defendant cites evidence that, between February 2013 and August 2014, administrative hearings on criminal justice disqualifications resulted in only 13 reversals.  (Dkt. 74, Def.'s Resp. 11-12).  On that basis, defendant contends plaintiffs have failed to meet the numerosity requirement.  Having rejected defendant's redefinition

of the harm, the Court finds this argument meritless. Plaintiffs have adduced sufficient evidence to satisfy the numerosity requirement of Rule 23(a)(1).

### 3. Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." "[T]here need be only a single issue common to all members of the class." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996). Resolution of that issue should "affect all or a significant number of the putative class members," *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 424 (6th Cir. 1998), and should "advance the litigation." *Sprague v. Gen'l Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).

According to plaintiffs, the legal issue common to the Due Process Class is whether the disqualification notices were inadequate as a matter of constitutional and statutory law. The legal issue common to the subclass is whether disqualification based on Michigan's fugitive felon law and policy violated the SNAP Act. Again, defendant counters that the real injury plaintiffs allege is disqualification based on an erroneous LEIN match. Separate adjudications will thus be necessary

34

to determine whether each proposed class member did or did not have a valid outstanding felony warrant.

Again, the Court rejects defendant's redefinition of plaintiffs' injury. Plaintiffs have identified a single legal issue common to all members of the Due Process Class, and one common to all members of the Disqualification Subclass. The alleged inadequacy of the disqualification notices is "central to the validity of each one of the claims" – specifically, Counts I and II – of both the named plaintiffs and the class members. Likewise, whether Michigan's fugitive felon law and policy violates the SNAP Act is central to the validity of the claims of both the named plaintiffs and the class members in Counts III and IV. Resolution of these two issues will not only "advance the litigation," *Sprague,* 133 F.3d at 397, it will be dispositive of the claims of all class members. Plaintiffs have therefore met the commonality requirement of Rule 23(a)(2).

    4.   <u>Typicality</u>

Rule 23(a)(3) requires the claims of the class representatives to be typical of the claims of the class. The Sixth Circuit has concluded a

35

proposed class representative's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082. The result is that "the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interest of the class members." *Id.* The typicality requirement thus "ensures that the representative party adequately protects the interests of the proposed class." *Crawley*, 2009 U.S. Dist. LEXIS 40794, at *35.

Plaintiffs maintain the class representatives' claims arise from the same conduct of defendant, involve the same harm, and rest on the same legal theories. Yet again, defendant maintains plaintiffs' injuries "derive from the supposed mismatches" between plaintiffs and outstanding felony warrants in the LEIN. (Dkt. 74, Def.'s Resp. to Mot. Class Cert. 18.)

The named plaintiffs' claims, like those of the class, arise from the same conduct: (1) the allegedly inadequate disqualification notices, and (2) the application of the allegedly invalid fugitive felon law and policy.

Furthermore, the named plaintiffs' claims are based on the same legal theory as the class and subclass claims: that defendant's inadequate notice violated plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment and under the SNAP Act, and that defendant's denial, reduction, or termination of food assistance benefits based solely on a felony warrant match, without a determination that the applicant or recipient was fleeing to avoid prosecution or was actively sought by law enforcement, violated plaintiffs' substantive rights under the SNAP Act. *See Crawley*, 2009 U.S. Dist. LEXIS 40794, at *38-39.

### 5.   Adequacy

Rule 23(a)(4) requires the named plaintiffs to show that they have common interests with the unnamed class members, and will vigorously prosecute the interests of the class through qualified counsel. *Young*, 693 F.3d at 543. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 562 (6th Cir. 2007).

Because, as discussed above, the legal claims and injuries of the named plaintiffs are the same as those of the proposed class and subclass members, their interests in the litigation are common. As for the qualifications of proposed class counsel, their resumes demonstrate significant experience in class action suits related to public benefits programs such as Medicaid and SNAP.

Defendant insists that named plaintiffs are inadequate to represent the class, because they lack standing or their claims are moot. Defendant further claims proposed class counsel is inadequate because two of them have retired. (Dkt. 74, Def.'s Resp. to Mot. Class Cert. 19-20.) As discussed above, all named plaintiffs have standing, and the claims of only one plaintiff are moot. As for counsel, Jacqueline Doig, proposed lead class counsel, indicated at oral argument that she would continue to work until this case concludes, and defense counsel indicated defendant had no objection to Doig's qualifications as class counsel. The qualifications of the other proposed class counsel are apparent from their experience handling similar matters. The Court accordingly finds that plaintiffs have satisfied the requirements of Rule 23(a)(4).

6.   <u>Whether defendant acted on grounds generally applicable to the class</u>

Rule 23(b)(2) requires plaintiffs to show that defendant has acted or refused to act on grounds generally applicable to the class.  It applies "only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Wal-Mart*, 131 S. Ct. at 2557.  Thus, "[l]awsuits alleging class-wide discrimination are particularly well suited for 23(b)(2) treatment since the common claim is susceptible to a single proof and subject to a single injunctive remedy."  *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976).  Such is the case here: defendant has allegedly provided the same inadequate notice of disqualification to all proposed class members, and has denied, reduced, or terminated food assistance of all proposed subclass members based on the same allegedly invalid law and policy.

Defendant again counters that proposed class members have not suffered the same injuries.  She adds that classwide injunctive relief is

inappropriate, apparently on the grounds that defendant's arguments about the adequacy of the notices and the validity of the fugitive felon policy are correct. (Dkt. 74, Def.'s Resp. to Pls.' Mot. Summ. J. 22.) But this latter argument concerns the merits of plaintiffs' claims, which are not properly considered in determining a motion for class certification. The Court has already rejected the former argument. Accordingly, the Court finds that plaintiffs have satisfied the requirements of 23(b)(2).

## C.    Conclusion

Plaintiffs have met their burden to show this action satisfies the requirements of Fed. R. Civ. P. 23(a) and 23(b). Accordingly, the Court will grant plaintiffs' Amended Motion to Certify Class (Dkt. 39).

## IV.   Cross-motions for Summary Judgment

Plaintiffs' summary judgment arguments overlap with two of defendant's arguments in favor of dismissal. Those arguments will accordingly be treated together below, as cross-motions for summary judgment. Defendant's mootness argument has been dispensed with above. The absence of a private right of action under the SNAP Act would preclude Counts II, III, and IV. The Court will therefore treat

that issue before reaching the parties' arguments on the substantive claims.

## A.   Standard of Review

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir.2002)).

## B.   Private right of action

The SNAP Act does not explicitly confer a private right of action to enforce its provisions.   The test for determining whether a federal statute confers an implied right enforceable under 42 U.S.C. § 1983 was articulated by the Supreme Court in *Blessing v. Freestone*, 520 U.S. 329

(1997), and clarified in *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002). Under *Blessing*, a plaintiff seeking to enforce a statutory provision by private suit must show that (1) Congress "intended that the provision in question benefit the plaintiff"; (2) "the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence"; and (3) "the statute . . . unambiguously impose[s] a binding obligation on the States." *Blessing*, 520 U.S. at 340-41. The *Gonzaga* Court clarified the first element of the test: only an "unambiguously conferred <u>right</u> . . . not the broader or vaguer <u>benefits</u> or <u>interests</u>" can support an action brought under § 1983. *Gonzaga*, 536 U.S. at 283 (emphasis added).

The Court's analysis should focus not on the SNAP Act as a whole, but on "individual provisions of the statute to determine whether a private right of action exists under each portion." *John B. v. Goetz*, 626 F.3d 356, 362 (6th Cir. 2010) (finding individual provisions in Medicaid Act enforceable under § 1983); *accord Westside Mothers v. Olszewski*, 454 F.3d 532, 538-44 (6th Cir. 2006) (holding some provisions of Medicaid Act supported private right of action, while others did not).

1.    <u>The provisions at issue</u>

42

Two SNAP Act provisions are at issue. Section 2014(a) underpins plaintiffs' claim in Count III. It provides that "[a]ssistance under this program shall be furnished to all eligible households who make application for such participation." Section 2020(e)(10) applies to plaintiffs' claim in Count II. It requires a state plan of operation to provide notice, fair hearing, and a "prompt determination" to "any household aggrieved by the action of the State agency under any provision" of the state plan.

2.   <u>Whether the provision creates an "unambiguously conferred right"</u>

This element is the focus of defendant's challenge. The goal of the court's inquiry regarding this element is to determine congressional intent. *Gonzaga*, 536 U.S. at 285. To that end, the Court's analysis should focus on the text of the statutory provision at issue, and on the structure of the overall statute. *See id.* at 286 ("where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action."). For the provision to create a private right, the text must be "phrased in terms of

the persons benefited," *id.* at 284, and must have an individual, rather than an "aggregate," focus.  *See id.* at 288.

Defendant makes three arguments for finding no private right of action in the SNAP statute: (1) the statute contains no rights-creating language; (2) the statute's focus is aggregate rather than individual; and (3) courts have found the statute creates no private right of action.

a.    Section 2020(a)(3)(B)(ii)

As an initial matter, plaintiffs point out that section 2020(a)(3)(B)(ii) contains the following language: "Records described in subparagraph A [namely, records necessary to determine the state program's compliance with federal law] shall . . . be available for review in any action filed by a household to enforce any provision of this chapter (including regulations issued under this chapter) . . ." (emphasis added).  As plaintiffs maintain, this provision would make little sense if Congress did not intend for the SNAP Act to be enforceable by private action.  The language here contemplates private actions to enforce any provision of Chapter 51 (the SNAP program), as well as any related regulations.

44

At the hearing on these motions, defendant argued for the first time that section 2020(a)(3)(B)(ii) refers not to private actions to enforce the SNAP Act, but to state administrative review of benefits determinations.  This argument is unpersuasive.  Section 2020(a)(3)(B)(ii) concerns an "action" that is "filed" to "enforce any provision" of the SNAP Act.  Section 2020(e)(10), which obliges states to provide for review of agency actions, requires a "hearing" and a "determination," not an "action."  7 U.S.C. § 2020(e)(10).  It is a "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995).  A corollary rule is that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (citation omitted).  Here, the Court presumes Congress used the term "action" in section 2020(a)(3)(B)(ii) to mean something different from "hearing"  in section 2020(e)(10).  If Congress meant otherwise, it could easily have said so – by using the same word in both sections.

45

Defendant's argument is also at odds with the common usage of the terms "action" and "hearing." "Action" and "filed" are terms associated with bringing a lawsuit in court, not with seeking administrative review of an agency decision. Plus, a "hearing" is more restricted in scope than an "action," which may comprise multiple hearings and, ultimately results in a judgment rather than a "determination."

Section 2020(a)(3)(B)(ii) alone is arguably enough to show that Congress intended for a private right of action to be available under the SNAP Act. Application of the *Blessing / Gonzaga* test to the provisions at issue here leads to the same conclusion.

b.   <u>Language of the provisions</u>

Defendant points to Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments Act of 1972 (both cited by the *Gonzaga* Court) as examples of "rights-creating" language. Those statutes provide that "No person . . . shall . . . be subjected to discrimination . . ." By contrast, in defendant's view, section 2020 of the SNAP Act speaks in terms of state responsibility – e.g., "The State

agency shall provide for the granting of a fair hearing . . ." 7 U.S.C. § 2020(e)(10).   Defendant does not address the language of section 2014(a).

Section 2014(a) is "phrased in terms of the persons benefited." The focus throughout this provision is on which households are eligible to participate in SNAP.   The final sentence of the section states, "Assistance under this program shall be furnished to all eligible households who make application for such participation."

Section 2020(e)(10) is also "phrased in terms of the persons benefited."   Although the section begins with the phrase "The State agency shall provide," the substance of what the agency must provide is focused on the individual households receiving benefits.   First, the agency must provide "for the granting of a fair hearing and a prompt determination thereafter to any household aggrieved by the action of the State agency under any provision of its plan of operation as it affects the participation of such household in the supplemental nutrition assistance program or by a claim against the household for an overissuance."   (emphasis added).   Second, "any household which timely requests such a fair hearing after receiving individual notice of

agency action reducing or terminating its benefits . . . <u>shall continue to participate and receive benefits</u> . . . until such time as the fair hearing is completed . . .” (emphasis added).  In the first sentence above, the focus is entirely on the right of an individual household to have a fair hearing and a prompt determination.  In the second sentence, “any household” is the grammatical subject of the sentence, which concerns the household’s right to continuation of benefits pending adjudication of its complaint.

As plaintiffs note, courts in this Circuit have found similar language in the Medicaid Act to create private rights.  (*See* Dkt. 80-11, Ex. J to Pls.’ Reply in Support of Mot. for Summ. J.)

Section 1396a(a) of the Medicaid Act is parallel to section 2020(e) of the SNAP Act.  Section 1396a(a) is titled “State plans for medical assistance: Contents.” The Sixth Circuit has held that language directing that “<u>[a] State plan</u> for medical assistance <u>must . . . provide</u> that [ ] <u>any individual eligible for medical assistance</u> (including drugs) may obtain such assistance” establishes a private right of action.  *Harris v. Olszewski*, 442 F.3d 456, 461 (6th Cir. 2006) (analyzing Medicaid provision, 42 U.S.C. § 1396a(a)(23)) (emphasis added).  The

48

Court reasoned that "in giving 'any individual eligible for medical assistance' a free choice over the provider of that assistance, the statute uses the kind of individually focused terminology that unambiguously confers an individual entitlement under the law." *Id*. And rather than interpret the clause beginning "A State plan" as showing the provision lacked an individual focus, the Court reasoned that "by saying '[a] State plan . . . must . . . provide' this choice, the statute uses the kind of rights-creating, mandatory language that the Supreme Court and our court have held establishes a private right of action." *Id.* at 461-62 (internal citations and quotation marks omitted).

Section 1396a(a)(3) states that "<u>A State plan</u> for medical assistance <u>must provide</u> for granting an opportunity <u>for a fair hearing</u> before the State agency <u>to any individual</u> whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness . . ." 42 U.S.C. § 1396a(a)(3) (emphasis added). That provision was held enforceable under § 1983 in *Gean v. Hattaway*, 330 F.3d 758, 772-73 (6th Cir. 2003). Substituting "household" for "individual," the language of § 2020(e)(10) is closely parallel: "<u>The State agency shall provide</u> <u>for the granting of a fair hearing</u> and a prompt

determination thereafter <u>to any household</u> aggrieved by the action of the State agency under any provision of its plan of operation . . ." 7 U.S.C. § 2020(e)(10) (emphasis added).

Similarly, section 1396a(a)(8) of the Medicaid Act states that "<u>A State plan</u> for medical assistance <u>must provide that</u> . . . such <u>assistance shall be furnished</u> with reasonable promptness <u>to all eligible individuals</u> . . ." 42 U.S.C. § 1396a(a)(8). That provision was held enforceable by private action in *Westside Mothers v. Olszewski*, 368 F. Supp. 2d 740, 761-62 (E.D. Mich. 2005). Section 2014(a) of the SNAP Act states in similar language that "<u>Assistance</u> under this program <u>shall be furnished to all eligible households</u> who make application for such participation." 7 U.S.C. § 2014(a).

The plain language of sections 2020(e)(10) and 2014(a) is primarily "phrased in terms of the persons benefited" – namely, eligible households. Case law interpreting parallel language in the Medicaid Act confirms this conclusion.

     c.   <u>Aggregate vs. individual focus</u>

The parties' arguments here largely mirror those concerning the language of the provisions. As discussed above, the Court finds the focus of the relevant SNAP provisions to be on the individual households, not on the "aggregate services provided by the state" or a "generalized duty" of the state. *Gonzaga*, 536 U.S. at 281-82.

      d.   <u>Case law</u>

The only case defendant discusses in any depth is *Almendares v. Palmer*, No. 00-7524, 2002 U.S. Dist. LEXIS 23258 (N.D. Ohio 2003). In *Almendares*, the court held that section 2020(e)(1)(B) did not create an implied right. But as plaintiffs point out, that section is not at issue in this case – an important distinction, as the Court must examine the particular provision at issue to determine whether an implied right of action exists. *See Goetz*, 626 F.3d at 362. Moreover, in contrast to the provisions at issue here, the focus of section 2020(e)(1)(B) is expressly aggregate. Section 2020(e)(1)(B) pertains to the "use of appropriate bilingual personnel and printed material . . . in those <u>portions of political subdivisions</u> in the State" in which a "<u>substantial number of members of low-income households</u> speak a language other than English." 7 U.S.C. § 2020(e)(1)(B) (emphasis added). The provision's

focus is on political subdivisions and groups of households, not individual households. Section 2020(e)(1)(B) and the analysis in *Almendares* thus have little relevance to the statutory provisions at issue here.

A number of other courts have found provisions of the SNAP Act to have created private rights of action. *E.g.*, *Briggs v. Bremby*, No. 12-324, 2012 WL 6026167, at *12 (D. Conn. Dec. 4, 2012) (holding sections 2020(e)(3) and (e)(9) create private rights of action); *Williston v. Eggleston*, 379 F. Supp. 2d 561, 578 (S.D.N.Y. 2005) (holding sections 2020(e)(2)(B), (e)(3), and (e)(9) create private rights of action); One case, although decided before *Gonzaga*, applied the *Blessing* test in holding that one provision at issue here, § 2020(e)(10), created a private right of action. *Meachem v. Wing*, 77 F. Supp. 2d 431, 440 (S.D.N.Y. 1999). The court in *Meachem* found that section 2020(e)(10) created an individual right to a fair hearing, reasoning that "whether or not a fair hearing has been conducted properly depends solely on whether one particular recipient's benefits have been modified or terminated without the process that is required." *Id.* at 439. The Court finds this reasoning persuasive.

The other two cases cited by defendant deserve little weight.[2]  The court in *Willis v. Ahmed*, No. 10-10504 (E.D. Mich. Apr. 26, 2010) stated at a hearing on a motion to dismiss that "[n]o private action was intended by Congress for violation of the Food Stamp Act . . . the *Gonzaga* case has made that clear."  (Dkt. 30-9, Ex. I to Def.'s Resp. to Mot. TRO.)  The court did not analyze the specific provision at issue, *see Goetz*, 626 F.3d at 362, nor did it offer anything further on the issue. The analysis in *Howard v. Hawkins*, No. A-09-CA-577-SS (W.D. Tex. Oct. 14, 2009) is cursory and relies heavily on the use of the phrase "The State agency shall" in sections 2020(e)(3) and (e)(9) to find no private right of action.  As already discussed, the Court finds that reasoning unpersuasive.

3.   <u>Whether the rights asserted are too vague or amorphous to be enforceable</u>

Defendant does not appear in her briefing to dispute the second element of the *Blessing* test.  At the hearing, however, defendant argued that judicial competence to enforce rights under the SNAP Act would be

---

[2] Plaintiffs correctly point out that defendant erroneously cites the decision in *Reynolds v. Giuliani*, 506 F.3d 183, 197-98 (2d Cir. 2007) as holding provisions of the SNAP Act unenforceable.  *See id.* at 190 (finding theory of liability premised on private right of action in SNAP Act "not preserved on appeal" and therefore "abandoned").

"strained," in the sense that judicial enforcement would hamper the Secretary of Agriculture's ability to create uniform standards governing SNAP and to enforce those standards consistently. Plaintiffs responded at the hearing that this element refers to a court's technical competence to enforce a particular right, not to the possibility of conflicting court decisions or standards. The Court agrees with plaintiffs. As originally articulated in *Blessing*, judicial competence is strained when the relevant statutory standard gives little or no guidance on how it should be enforced. *See Blessing*, 520 U.S. at 345. For example, a regulation requiring the state to have "sufficient staff" to carry out certain functions under the Social Security Act would "strain judicial competence" to enforce, because it provided no guidance as to what "sufficient" meant. *Id.* at 346.

At any rate, the rights at issue – to a fair hearing, and to assistance upon application by an eligible household – are not "vague" or "amorphous," nor would it "strain judicial competence" to enforce them. Courts routinely determine the adequacy of notice and hearing procedures, and the SNAP Act's "fleeing felon" standard is clear and objective.

54

4.     Whether the provisions are mandatory

The third element is not in dispute here: the language of the SNAP provisions is "mandatory, not precatory."  In particular, the provision at issue in Count II states that "The State plan of operation . . . shall provide . . . for the granting of a fair hearing . . ." 7 U.S.C. § 2020(e)(10) (emphasis added).  The provision at issue in Count III states that "Assistance under this program shall be furnished to all eligible households who make application for such participation."  7 U.S.C. § 2014(a) (emphasis added).

Having analyzed sections 2014(a) and 2020(e)(10) in the manner *Gonzaga* requires, the Court concludes that those provisions of the SNAP Act create individual rights.

5.     Whether Congress intended to create a private remedy

"Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284.  It is defendant's burden to rebut that presumption by showing that Congress either expressly, or "impliedly, by creating an enforcement scheme that is incompatible with individual enforcement

under § 1983," intended to preclude private suits to enforce the right. *Id.* at 285 n.4 (quoting *Blessing*, 520 U.S. at 341).

Defendant has made no such showing. Defendant suggests that the enforcement powers granted by the SNAP Act to the Secretary of Agriculture preclude § 1983 claims. Those powers comprise the mandatory withholding of administrative funding, in an amount determined "appropriate" by the Secretary, and the discretion to ask the Attorney General to seek injunctive relief against the relevant state agency. 7 U.S.C. § 2020(g). The Supreme Court and the Sixth Circuit have held these powers are not indicative of congressional intent to preclude § 1983 claims in other statutory contexts. *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 521-22 (1990) (finding Medicaid Act's authorization of the Secretary of Health and Human Services to withhold funds and approval of state plans was not "sufficiently comprehensive" to indicate Congress' intent to preclude § 1983 claims); *Wright v. City of Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418, 428 (1987) (holding U.S. Department of Housing and Urban Development's powers to audit and cut off federal funds insufficient to indicate congressional intent to preclude § 1983 claims to enforce

56

Housing Act); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004) (state administrative review procedures and authority of Attorney General to enforce Help America Vote Act not indicative of congressional intent to preclude § 1983 claims). Understandably so, as those powers are not directed at obtaining relief for aggrieved individuals. *See Gonzaga*, 536 U.S. at 289-90 (distinguishing *Wright* and *Wilder* on the ground that in those cases, unlike in *Gonzaga*, "an aggrieved individual lacked any federal review mechanism"); *Briggs*, 2012 WL 6026167, at *12 (finding aggrieved individuals lack federal review mechanism under SNAP Act and holding SNAP Act sections enforceable under § 1983).

Defendant suggests that the Secretary's withdrawal of funding or referral of the matter to the Attorney General could pressure a state to address individual SNAP Act claims. But too many contingencies are involved – the Secretary must find a "pattern of lack of compliance," exercise his or her discretion to refer the matter to the Attorney General, and must withhold enough funding to prompt state action, to name just three – to conclude that the statute's enforcement scheme would redress individual grievances and would thereby be

"incompatible" with § 1983 actions.   *See* 7 U.S.C. § 2020(g); *see also Gonzaga*, 536 U.S. at 285 n.4.

Defendant further suggests that the hearing requirement in § 2020(e)(10) evidences an intent to preclude § 1983 claims.   However, "the existence of a state administrative remedy does not ordinarily foreclose resort to § 1983." *Wright*, 479 U.S. at 427-28 (1987).

Even the court in the case primarily relied upon by defendant, *Almendares*, found that "[t]he administrative scheme in the Food Stamp Act is not the type of remedial scheme sufficiently comprehensive to supplant a § 1983 claim."   2002 U.S. Dist. LEXIS 23258, at *16 n.4. Other courts addressing this issue have held likewise.   *Victorian v. Miller*, 813 F.2d 718, 723 (5th Cir. 1987); *Gonzalez v. Pingree*, 821 F.2d 1526, 1529 (11th Cir. 1987); *Briggs*, 2012 WL 6026167, at *12; *Williston*, 379 F. Supp. 2d at 577-78.

### 6.   Conclusion

7 U.S.C. §§ 2014(a) and 2020(e)(10) create individual, private rights enforceable under 42 U.S.C. § 1983.

## C.   Procedural due process (Counts I and II)

Plaintiffs maintain they are entitled to summary judgment on Counts I and II, which allege violation of procedural due process under the Fourteenth Amendment and under the SNAP Act, respectively. They argue that defendant's criminal justice disqualification notices were inadequate as a matter of constitutional and statutory law.

Defendant counters that she is entitled to summary judgment on Counts I and II, because the notices were adequate as a matter of both constitutional and statutory law, and because plaintiffs failed to show that state administrative remedies were inadequate.   Defendant also appears to argue that she is entitled to summary judgment on these counts because plaintiffs failed to exhaust state administrative remedies before filing this suit.

1.   <u>Inadequacy and exhaustion of state remedies</u>

As an initial matter, defendant argues that, in order to sustain their due process claim under Count I, plaintiffs must show their state administrative remedies failed to provide due process, citing *Jefferson v. Jefferson Cnty. Sch. System*, 360 F.3d 583, 585 (6th Cir. 2004). According to defendant, three individual plaintiffs – Woodward,

Copeland, and Anderson – failed to pursue state administrative remedies and are thereby estopped from challenging the adequacy of those remedies. (Dkt. 81, Def.'s Br. 11.) And plaintiff Barry secured relief through the state administrative process, proving that defendant provided due process of law. (*Id.* at 10-11.)

Defendant urges the Court to extend the application of *Jefferson* to Counts II-IV. Defendant further asks the Court to apply an exhaustion of state remedies requirement and dismiss plaintiffs' claims for failure to pursue their claims in state proceedings.

a.   <u>Inadequacy of state remedies</u>

*Jefferson* does not apply in this case. Shortly after deciding *Jefferson*, the Sixth Circuit held that *Jefferson* only applies to procedural due process claims brought under § 1983 when the property deprivation results from a "random or unauthorized act." *Mitchell v. Fankhauser*, 375 F.3d 477, 484 (6th Cir. 2004). When, as here, the alleged deprivation results from "established state procedures," however, a plaintiff is "required neither to plead nor prove the inadequacy of . . . state-law remedies in order to prevail." *Id.* at 483-84.

60

Count I is therefore not barred by plaintiffs' failure to show administrative remedies were inadequate. It follows that Counts II and III, which are also brought pursuant to § 1983, are not barred. *Jefferson* has no application to Count IV, as that count is not brought pursuant to § 1983.

### b.   Exhaustion of state remedies

As already discussed in section II.B *supra*, the Supreme Court has held that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982). Courts have nonetheless recognized that a federal statute may contain an explicit or implicit requirement that a plaintiff exhaust administrative remedies before bringing a § 1983 claim. *Id.* at 502 n.4. "The mere provision of state administrative remedies, however, is not enough to demonstrate an implicit Congressional intent to impose an exhaustion requirement on a plaintiff seeking to bring a § 1983 action." *Talbot v. Lucy Corr Nursing Home*, 118 F.3d 215, 219 (4th Cir. 1997). "If there is doubt as to whether an exception applies, courts should refrain from requiring exhaustion in § 1983 suits because *Patsy* leaves no doubt that

the presumption in *strongly* in favor of no exception." *Id.* (quoting *Alacare, Inc.-North v. Baggiano*, 785 F.2d 963, 967 (11th Cir. 1986).

Here, there is no explicit exhaustion requirement in the SNAP Act. While § 2020(e)(10) imposes notice and fair hearing requirements upon states, defendant points to no indication of an implicit congressional intent to require § 1983 plaintiffs to exhaust state administrative remedies before bringing suit, nor can the Court discern any such intent. *See Commonwealth of Mass. v. Lyng*, 893 F.2d 424, 427 (1st Cir. 1990) ("[T]he scheme of the food stamp statute does not require exhaustion"); *Williston*, 379 F. Supp. 2d at 569-70 (same, citing other S.D.N.Y. cases).

2. <u>Constitutional due process</u>

    a. <u>Standard</u>

In *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970), the Supreme Court established that recipients of public benefits must receive an evidentiary hearing before suspension or termination of benefits. For such a hearing to be conducted "at a meaningful time and in a meaningful manner," *id.* at 267, a recipient must also receive "timely

and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Id.* at 268.

Adequate notice, for purposes of due process, must "inform a recipient of the precise questions raised about his continued eligibility" and state "the legal and factual bases" for the state's action. *Goldberg*, 397 U.S. at 268. The notice must comprise "(1) a detailed statement of the intended action . . . (2) the reason for the change in status . . . 3) citation to the specific statutory section requiring reduction or termination; and (4) specific notice of the recipient's right to appeal. *Garrett v. Pruett*, 707 F.2d 930, 931 (6th Cir. 1983).

The central point emerging from the relevant Supreme Court and Sixth Circuit cases is that the explanation of the proposed action and of the reasons for the action must be detailed enough to allow for a meaningful hearing. *See Morgan v. United States*, 304 U.S. 1, 18 (1938) ("The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them"); *In re Gault*, 387 U.S. 1, 33 (1967) ("Notice, to

comply with due process requirements . . . must set forth the alleged misconduct with particularity"); *Hamby v. Neel*, 368 F.3d 549, 561 (6th Cir. 2004) (holding notice of rejection of application for benefits violated due process where applicants were "not adequately informed as to how to fully receive the benefits to which they were entitled . . . nor were they fully apprised of the reasons for denial").

    b.   <u>Application</u>

The notice received by Barry on 12/31/12 (Dkt. 70-2, Ex. A to Second Amended Compl.) is titled "Notice of Case Action." It is representative of all the notices at issue in this case, although later notices include a minor change, discussed below. The notice lists Barry's name and address, his case number, and provides the name of a DHS specialist, the program office address, and telephone and fax numbers. The notice states in relevant part:

**Food Assistance Program Summary**

Period: 02/01/2013 – Ongoing

Action: Closed

Your ongoing benefit has been cancelled but you will continue to receive benefits through the day before the period listed above.

**Reason for Intended Action**

Walter D Barry – Not Eligible

You or a member of your group is not eligible for assistance due to a criminal justice disqualification. Please contact your local law enforcement agency to resolve.

Manual Item(s): BEM 203, ERM 202

The notice then states that "you do have a right to a hearing to contest the Department's calculation that you or a member of your group are no longer eligible for program assistance." An attached form titled "Request for a Hearing" provides the date by which DHS must receive a hearing request in order "to continue your assistance at the former level or to have your current assistance continued or reinstated." The form also gives the last date by which DHS must receive the hearing request. Instructions are provided for requesting an administrative hearing. The notice recipient is advised that "[a]t the hearing, you can explain why you think this action is wrong, and give evidence." The form also states that the person may contact a local DHS office to get more information about how the hearing works. A web address is provided "[t]o find out if free legal help is available in your area."

A later version of the notice changes the language in the "Reason for Intended Action" section as follows: "Please have the disqualified member of your group contact a local law enforcement agency – such as a police department, sheriff's department or the Michigan State Police – to resolve. The law enforcement agency will require you to provide picture identification." (Dkt. 50-8, Ex. Y to Pl.'s Mot. Summ. J.)

It is undisputed that the notices meet the fourth *Garrett* factor, as they include notice of an applicant's / recipient's appeal rights.  As to the third factor, the notices do not cite to the specific statutory section requiring reduction or termination of benefits.  Rather, the notices refer to the relevant section of the BEM.  (*E.g.,* Dkt. 70-18, Ex. Q to Pls.' Second Amend. Compl.)  The BEM, in turn, lists the state and federal statutory sections purportedly supporting the reduction or termination of benefits.  (*E.g.*, Dkt. 70-30, Ex. CC to Pls.' Second Amend. Compl.) Defendant maintains this satisfies the third *Garrett* factor, but cites no authority in support.  (Dkt. 75, Def.'s Resp. to Pls.' Mot. Summ. J. 9.)

The crux of the issue, however, is whether the notices adequately explain the reduction or termination, and the reasons for it – the first and second *Garrett* factors.

The notices state the intended action – denial or reduction of benefits.  For example, the May 16, 2013 notice sent to Barry provides, under the heading "Intended Action," a summary of benefits – in this instance, listing "Food Assistance Program."  (Dkt. 70-6, Ex. E to Pls.' Second Amend. Compl.)   The notice shows the relevant action as "closed" and states, "[y]our ongoing benefit has been cancelled but you will continue to receive benefits through the day before the period listed above." (*Id.*)

The reason given for the action is simply "You or a member of your group is not eligible for assistance due to a criminal justice disqualification." (Dkt. 70-2, Ex. A to Second Amended Compl.)  This fails to indicate whose conduct is at issue.  It also fails to indicate which of the five types of criminal justice disqualifications applied by DHS is being invoked. (*See* Dkt. 49-8, Ex. G to Pls.' Mot. Summ. J.)  From at least 2012 to mid-2013, the notices referred to section 203 of the BEM, where five types of criminal justice disqualifications from public assistance benefits were listed.  (*See id.*)  In June 2013, DHS placed the fugitive felon disqualification in its own section of the BEM (204).  (Dkt. 49-5, Ex. D to Pls.' Mot. Summ. J.)  But the notices thereafter continue

67

to use the general phrase "criminal justice disqualification." Thus, a notice recipient must still be able to (1) determine that "BEM 204" refers to the Bridges Eligibility Manual, section 204, (2) determine that the relevant type of criminal justice disqualification can be found there, and (3) get access to the BEM. (*See* Dkt. 70, Second Amended Compl. ¶ 300.) Even if a notice recipient locates a copy of the BEM and determines the type of disqualification, he or she still does not know anything about the outstanding warrant – not the underlying charge, nor which law enforcement agency issued the warrant. The recipient thus has no basis for making an informed decision whether to contest the disqualification, nor what issues need to be addressed at a hearing.

Defendant maintains that notice recipients could call the DHS contact person and number listed on the notice to receive further information regarding their disqualification. But defendant cannot satisfy due process by requiring notice recipients to call elsewhere. *See Boatman v. Hammons*, 164 F.3d 286, 290 (6th Cir. 1998). Moreover, in this instance such a call would be fruitless: DHS staff are instructed "not to disclose 'Fugitive Felon' status information to the individual." (Dkt. 49-2, Ex. A to Pls.' Mot. Summ. J.; *see also* Dkt. 49-17, Ex. P to

Pls.' Mot. Summ. J. 3 ("DHS specialists are <u>NOT</u> to inform a client of their fugitive felon status.").)

Defendant further maintains that notice recipients can obtain the necessary information by contacting law enforcement.   This is potentially as ineffective as contacting DHS, as the named plaintiffs' experiences shows.   Law enforcement may not be able to determine which warrant is causing the disqualification, as happened in Barry's case.  (Dkt. 70, Second Amended Compl. ¶¶ 28-30; Dkt. 70-3, Ex. B to Second Amended Compl.)   He discovered the existence of the first outstanding warrant only through defendant's intervention.  (Dkt. 70, Second Amended Compl. ¶ 66; Dkt. 70-11, Ex. J to Second Amended Compl.)  Woodward experienced similar difficulty, despite following the notice's instructions and contacting law enforcement: she contacted the Taylor police department about a misdemeanor case, but was unaware of an outstanding felony warrant in Livingston County.  (Dkt. 51-9, Ex. QQ to Pls.' Mot. Summ. J. ¶¶ 17-19; Dkt. 52-1, Ex. ZZ to Pls.' Mot. Summ. J.)   She only discovered the existence of the felony warrant through defendant's intervention.

At least two courts in other districts have analyzed notices of termination of federal food assistance benefits that are as brief and lacking in detail as the notice at issue here. *Febus v. Gallant*, 866 F. Supp. 45 (D. Mass. 1994); *Ortiz v. Eichler*, 616 F. Supp. 1046 (D. Del. 1985), *aff'd*, 794 F.2d 889 (3d Cir. 1986).

Massachusetts' notice of termination of public benefits, including federal food assistance benefits, gave as a reason for disqualification that "you and/or a household member are living outside of Massachusetts and do not intend to return soon." *Febus*, 866 F. Supp. at 46. The court held that notice constitutionally inadequate. *Id.* at 47. Delaware's notices contained one-sentence explanations for termination of benefits, including federal food assistance benefits, such as, "children's wages exceed eligibility limit," or "you are over the gross income eligibility limit," or "you did not provide a protective payee as requested." *Ortiz*, 616 F. Supp. at 1061. The court held those notices constitutionally inadequate. *Id.* at 1063.

Other courts have held similar boilerplate, nonspecific statements constitutionally inadequate. *Gault*, 387 U.S. at 31 (holding statement "said minor is a delinquent minor" constitutionally inadequate notice of

70

charge); *Hamby*, 368 F.3d at 560 (holding notice stating applicants for state health insurance had failed to apply during open enrollment period constitutionally inadequate for failing to specify that applicants were uninsurable); *Moffit v. Austin*, 600 F. Supp. 295, 297 (W.D. Ky. 1984) (holding Medicaid notices stating "Your care needs no longer meet the criteria for intermediate care" or "according to information in your medical record you no longer require the care provided" constitutionally inadequate).

Defendant relies primarily on *Rosen v. Goetz*, 410 F.3d 919, 930-31 (6th Cir. 2005), for the proposition that due process does not require notices to include specific, individualized reasons for benefit denial, reduction, or termination.  (Dkt. 81, Def.'s Mot. to Dismiss 8.)   But defendant's reliance is misplaced: the *Rosen* court held the notices in that case adequate because "the very facts the plaintiffs claim are missing [*sc.* from the termination notices] are supplied by the State through a second letter that follows the Termination Notice and that the Termination Notice itself references and brings to the attention of recipients."  410 F.3d at 931.  While defendant is technically correct that the <u>notice itself</u> does not need to include specific, individualized

reasons for the agency action, those details must nonetheless be provided in some form. *See id.* ("Due process does not require 'reasonably calculated' notice to come in just one letter, as opposed to two."). Unlike in *Rosen*, they were not provided here.

Defendant's notice is inadequate in another respect: it fails to inform recipients "as to how to fully receive the benefits to which they were entitled." *Hamby*, 368 F.3d at 561. The claims in *Hamby* focused on health benefit denial notices sent by the Tennessee Department of Health. The notices in *Hamby* were constitutionally inadequate because they did not inform benefit applicants that they had to appeal the denial, rather than reapply, to receive full retroactive benefits, and what the consequences of filing new applications would be. *Id.* at 560.

The notice here similarly fails to inform recipients what they must do to lift the disqualification. If a recipient "resolves" the disqualification, benefits are automatically reinstated only if other household members are "active" – i.e., continue to receive the type of assistance from which the notice recipient has been disqualified. (Dkt. 49-16, Ex. O to Pls.' Mot. Summ. J., BAM 811.) Otherwise, a disqualified individual must not only "resolve" the criminal justice

disqualification with law enforcement, but must also reapply for benefits. The notice fails to communicate this information. The notice also fails to make clear whether a hearing request is necessary to resolve disqualifications, even if the issue is resolved with law enforcement.

In sum, the disqualification notice fails to provide the due process required by the Fourteenth Amendment.

3.    SNAP Act and regulations

a.    Notice requirements

Section 2020(e)(10) obligates state agencies to provide "for the granting of a fair hearing" to households whose food assistance is reduced or terminated. While not explicitly requiring notice, it is presumed that a household will "receiv[e] individual notice of agency action reducing or terminating its benefits."

The regulations implementing section 2020 require that, if an application for food assistance is denied,

> the State agency shall provide the household with written notice explaining the basis for the denial, the household's right to request a fair hearing, the telephone number of the

food stamp office (a toll-free number or a number where collect calls will be accepted for households outside the local calling area), and, if possible, the name of the person to contact for additional information. If there is an individual or organization available that provides free legal representation, the notice shall also advise the household of the availability of the service.

7 C.F.R. § 273.10(g)(ii) (emphasis added). When the state agency reduces or terminates benefits, it must "provide the household timely and adequate advance notice before the adverse action is taken." 7 C.F.R. § 273.13(a). The regulation further provides that

The notice of adverse action shall be considered adequate if it <u>explains in easily understandable language</u>: The proposed action; the reason for the proposed action; the household's right to request a fair hearing; the telephone number of the food stamp office (toll-free number or a number where collect calls will be accepted for households outside the local calling area) and, if possible, the name of the person to contact for additional information; the availability of continued benefits; and the liability of the household for any overissuances received while awaiting a fair hearing if the hearing official's decision is adverse to the household. If there is an individual or organization available that provides free legal representation, the notice shall also advise the household of the availability of the service.

7 C.F.R. § 273.13(a)(2) (emphasis added).

Other courts have interpreted adequacy, for purposes of this regulation, to require an individualized, specific explanation of the adverse action and the reasons for it. For example, the court in *Febus*, 866 F. Supp. at 47, held that Massachusetts' notice stating that "you and/or a household member are living outside of Massachusetts and do not intend to return soon" not only failed to provide constitutional due process, but also failed to meet the requirements of § 273.13(a)(2).

b.   Application

Defendant's disqualification notice fails to meet the requirements of the SNAP Act and its supporting regulations for the same reasons that it is constitutionally inadequate. As discussed above, the notices do not "explain" the reasons for denial or termination, and it would be fruitless for recipients to use the contact information provided to seek further information.

4.   Conclusion

Defendant's disqualification notice is inadequate under both the Fourteenth Amendment's due process clause and under section 2020(e)(10) of the SNAP Act, and its implementing regulations, 7 C.F.R.

§§ 273.10(g) and 273.13(a).  Plaintiffs are therefore entitled to summary judgment on Counts I and II.

To meet the requirements of constitutional due process and of the SNAP Act, defendant's notice must explain, in detail:

(1) the nature of the intended action and its duration;

(2) the factual and legal bases for the action, including:

    (a) which type of criminal justice disqualification (e.g., fugitive felon status) is at issue,

    (b) the name of the person whose alleged conduct has resulted in the disqualification,

    (c) the date of the relevant warrant or conviction, as well as any other identifying information, including but not limited to a warrant number, case number, or National Crime Information Center number,

    (d) the jurisdiction where the conviction occurred or the warrant was issued,

(e) the name of a specific person or entity with knowledge of the basis for the disqualification whom the individual can contact for additional information,

(f) where applicable, a statement that, in accordance with the Food and Nutrition Act of 2008, 7 U.S.C. § 2015(k), defendant has determined that (i) the disqualified individual is fleeing to avoid prosecution, arrest, or custody or confinement for a felony, and (ii) law enforcement is actively seeking the individual; and

(3)    the specific actions a disqualified individual can take to obtain resolution of the disqualification and full access to benefits.

Defendant already has access to at least some of this information through the fugitive felon interface.  (*See* Dkt. 49-10, Ex. I to Pls.' Mot. Summ. J.)  Moreover, defendant already follows at least some of these requirements in the context of child protection, foster care, and juvenile justice cases.  (*See* Dkt. 52-6, Ex. EEE to Pls.' Mot. Summ. J.; Dkt. 52-7, Ex. FFF to Pls.' Mot. Summ. J.; Dkt. 52-8, Ex. GGG to Pls.' Mot. Summ. J.)  For example, defendant requires Child Protective Services (CPS) staff to verify LEIN information before including it in narratives in

reports, petitions, and other documents. (Dkt. 52-6, Ex. EEE to Pls.' Mot. Summ. J. 5.) Information is verified by <u>CPS</u> – for example, by contacting law enforcement or the relevant prosecuting attorney's office. (*Id.*) Staff are "encouraged" to consult with the prosecuting attorney or DHS counsel to assess the evidentiary value of corroborating information. (*Id.* at 2.) The Court can discern no reason why defendant cannot similarly verify LEIN information before disqualifying applicants for and recipients of public assistance benefits, and communicate that information in the disqualification notice.

Moreover, DHS staff already contact Michigan's Office of the Inspector General (OIG) when a recipient of a disqualification notice comes into a local DHS office requesting information. (Dkt. 49-2, Ex. A to Pls.' Mot. Summ. J.; Dkt. 49-3, Ex. B to Pls.' Mot. Summ. J.) An OIG agent then verifies the warrant, determines if the warrant is still active, and then contacts the relevant law enforcement agency to determine if they will send someone to the DHS office to arrest the person. (Dkt. 49-3, Ex. B to Pls.' Mot. Summ. J.) In other words, at least in some circumstances, defendant verifies the warrant and determines whether law enforcement is "actively seeking" the notice recipient. *See* 7 U.S.C.

§ 2015(k)(2) (requiring law enforcement to be "actively seeking" a person for that person to be disqualified from SNAP benefits). There is no obvious reason why defendant cannot make the "actively seeking" determination <u>before</u> issuing a disqualification notice, and include the basis for that determination in the notice. With respect to at least some of the notice requirements listed above, then, the burden on defendant appears to be minimal.

## D.   Substantive violation of the SNAP Act (Counts III and IV)

Plaintiffs claim entitlement to summary judgment on Counts III and IV based on defendant's alleged failure to conform to the requirements of the SNAP Act. Counts III and IV represent alternative paths to the same result (namely, enjoining enforcement of Michigan's fugitive felon law and policy): (1) defendant violated plaintiffs' substantive right to benefits under the SNAP Act, by imposing invalid eligibility requirements on plaintiffs (Count III), and (2) defendant's fugitive felon law and policy are preempted by the SNAP Act (Count IV).

### 1.   <u>Text of the SNAP Act</u>

7 U.S.C. § 2015 is titled "Eligibility disqualifications." Section 2015(k) is titled "Disqualification of fleeing felons" and provides as follows:

(1) In general

No member of a household who is otherwise eligible to participate in the supplemental nutrition assistance program shall be eligible to participate in the program as a member of that or any other household during any period during which the individual is--

(A) fleeing to avoid prosecution, or custody or confinement after conviction, under the law of the place from which the individual is fleeing, for a crime, or attempt to commit a crime, that is a felony under the law of the place from which the individual is fleeing or that, in the case of New Jersey, is a high misdemeanor under the law of New Jersey; or

(B) violating a condition of probation or parole imposed under a Federal or State law.

(2) Procedures

The Secretary shall--

(A) define the terms "fleeing" and "actively seeking" for purposes of this subsection; and

(B) ensure that State agencies use consistent procedures established by the Secretary that disqualify individuals whom law enforcement authorities are actively seeking for the purpose of holding criminal proceedings against the individual.

7 U.S.C. § 2015(k).  The SNAP Act prohibits states from imposing "any other standards of eligibility as a condition for participating in the program," 7 U.S.C. § 2014(b), and requires the eligibility standards in state plans to be "in accordance with sections 2014 and 2015 of [the SNAP Act] and to "include no additional requirements imposed by the State agency."  *Id.* § 2020(e)(5).

The Michigan law at issue is Mich. Comp. Laws § 400.10b, a provision enacted in 1996 as part of Michigan's Social Welfare Act, and then amended in 2011.  1996 Mich. Pub. Acts 190; 2011 Mich. Pub. Acts 2011.  Section 400.10b provides that "the department [*sc.* of Human Services] shall not grant public assistance under this act to an individual if the department receives information . . . that the individual is subject to arrest under an outstanding warrant arising from a felony charge against that individual in this or any other jurisdiction."  The Michigan law does not mention fleeing or fugitive status, nor does it distinguish persons whom law enforcement is actively seeking.

2.   Whether state law controls the definition of "fleeing"

At oral argument, defendant suggested for the first time that state law controls the definition of "fleeing" in section 2015(k).  In defendant's view, the clause "under the law of the place from which the individual is fleeing" modifies all that comes before it.  Thus, whether a person is "fleeing to avoid prosecution" is determined by reference to Michigan law in this case.

While grammatically possible, defendant's position is legally implausible.  It is well-established that "in the absence of a plain indication to the contrary, . . . Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) (quoting *Jerome v. United States*, 318 U.S. 101, 104 (1943)).  This is especially true where, as with the SNAP Act, the federal law is intended to have "uniform nationwide application."  *See Holyfield*, 490 U.S. at 43-44.  There is no "plain indication" in section 2015(k) that Congress intended for states to define "fleeing."  In fact, there is an obvious indication to the contrary: the express provision that the Secretary of Agriculture "shall define" both "fleeing" and "actively seeking."  7 U.S.C. § 2015(k)(2)(A).

Alternatively, defendant suggests the Court should decline to interpret section 2015(k) in deference to the proposed rule that would, among other things, define the terms "fleeing" and "actively seeking." (Dkt. 75, Def.'s Resp. to Pls.' Mot. Summ. J. 21); *see* Clarification of Eligibility of Fleeing Felons, 76 Fed. Reg. 51,907 (proposed Aug. 19, 2011) (to be codified at 7 C.F.R. pts. 272-73).   To be sure, where Congress has expressly delegated to the agency authority to define a statutory term, the agency's definition is "entitled to more than mere deference or weight," but rather "is entitled to legislative effect." *Schweiker v. Gray Panthers*, 453 U.S. 34, 44 (1981).  But the courts "do not abdicate review" in such circumstances.[3]  *Id.*  Here, of course, there is no agency definition to review, as the relevant rule has not yet been finalized.   Defendant points to no authority for the proposition that the Court cannot determine the meaning of the statute in the interim, nor has the Court itself found any such authority.   Indeed, the Court's determination of the meaning of "fleeing to avoid prosecution" would be subject to displacement by any conflicting definition later promulgated by the Secretary.   *See Nat'l Cable & Telecomms. Ass'n v. Brand X*

---

[3] Any definition promulgated by the agency would still be subject to challenge under the Administrative Procedure Act, 5 U.S.C. § 706.  *See Schweiker*, 453 U.S. at 44.

*Internet Servs.*, 545 U.S. 967, 982-84 (2005). But absent any authority to the contrary, the Court discerns no compelling reason why plaintiffs' claims should be left in legal limbo.[4]

### 3.   Plain language of the statute

Turning then to section 2015(k), the Court begins with "[a] fundamental canon of statutory construction . . . that when interpreting statutes, the language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear." *United States v. Douglas*, 634 F.3d 852, 858 (6th Cir. 2011) (citation and internal quotation marks omitted).  Plaintiffs argue that the Michigan law and defendant's policy violate the plain language of § 2015(k), because they do not require a determination that an individual is both fleeing to avoid prosecution or custody and is actively sought by law enforcement.

The language of the SNAP Act plainly requires that the person be "fleeing to avoid prosecution" in order to be disqualified.   "Fleeing" necessarily entails movement away from a place.  *See* The American

---

[4] At the time of the issuing of this opinion, the proposed rule defining "fleeing" and "actively seeking" have been pending for over three years.

Heritage Dictionary of the English Language (5th ed. 2014) (defining "flee" as "[t]o run away, as from trouble or danger"); Webster's Third New International Dictionary of the English Language (1993) (defining "flee" as "to run away"). The other appearance of the word "fleeing" in section 2015(k)(1)(A) confirms this reading: the relevant crime must be a felony "under the law of the place <u>from which the individual is fleeing</u>" (emphasis added). A person cannot be fleeing from a place (such as the state of Michigan) if he or she remains in that place. Furthermore, by specifying that the person must be fleeing <u>to avoid prosecution</u>, the SNAP Act incorporates an element of intent.

Neither of these elements – actual physical flight, or the intent to avoid prosecution, custody, or confinement – is present in the Social Welfare Act. *See* Mich. Comp. Laws § 400.10b(1). Disqualification is triggered simply by the existence of an outstanding warrant. *Id.* The existence of an outstanding warrant does not necessarily imply flight or intent. (*See* Dkt. 79-4, Ex. C to Pls.' Reply in Support of Amended Mot. Class Cert., Shea Aff.) Under Michigan law, an arrest warrant directs law enforcement to apprehend a person; it does not order the person to turn him- or herself in. *See* Mich. Comp. Laws § 764.1b. DHS policy

implementing section 400.10b likewise fails to require a determination that a person is "fleeing to avoid prosecution."  *See* BEM 203, 204.

The SNAP Act also clearly requires law enforcement to be "actively seeking" a person for that person to be disqualified from receiving food assistance benefits.  7 U.S.C. § 2015(k)(2).  It is equally clear that the Social Welfare Act lacks this requirement.  *See* Mich. Compl. Laws § 400.10b.  At oral argument, defendant suggested the mere existence of an outstanding warrant means that law enforcement is, in fact, actively seeking the person.   This is not a plausible argument.  Defendant's interpretation would write the word "actively" out of the SNAP Act: if issuing a warrant equates to "actively seeking," then "actively seeking" would be no different from plain "seeking."  *See Mitchell v. Chapman,* 343 F.3d 811, 825 (6th Cir. 2003) ("Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.").  DHS policy implementing section 400.10b likewise fails to require determinations that a person is actively sought by law enforcement. *See* BEM 203, 204.

In fact, DHS staff are instructed to proceed with disqualification even when law enforcement, upon being informed that a benefits applicant or recipient with an outstanding warrant is present at a DHS office, declines to arrest the person.  (Dkt. 49-3, Ex. B to Pls.' Mot. Summ. J.)

The Court's reading of the plain language of the SNAP Act finds support in the nearly identical language of the Social Security Act and the related case law.  42 U.S.C. § 1382(e)(4)(A)(i) disqualifies a person from receiving Supplemental Social Security Income (SSI) if the person is "fleeing to avoid prosecution, or custody or confinement after conviction, under the laws of the place from which the person flees, for a crime, or an attempt to commit a crime, which is a felony under the laws of the place from which the person flees."  Both this provision and section 2015(k) of the SNAP Act were enacted as sections 202(a)(5) and 821(k) of the same law: the Personal Responsibility and Work Opportunity Reconciliation Act of 1996.  There is accordingly a strong presumption that Congress meant the same thing by "flee" in both provisions. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994).

Courts interpreting the Social Security Act have found the mere existence of an outstanding felony warrant insufficient to show that a

person is fleeing and therefore disqualified from receiving SSI benefits. *Fowlkes v. Adamec*, 432 F.3d 90, 96 (2d Cir. 2005) ("The statute does not permit the Commissioner to conclude simply from the fact that there is an outstanding warrant for a person's arrest that he is fleeing to avoid prosecution."); *Cambero v. Commissioner*, No. 06-00551 (W.D. Mich. Sept. 10, 2007); *Blakely v. Commissioner*, 330 F. Supp. 2d 910 (W.D. Mich. 2004); *Hull v. Barnhart*, 336 F. Supp. 2d 1113 (D. Or. 2004); *Garnes v. Barnhart*, 352 F. Supp. 2d 1059 (N.D. Cal. 2004); *Thomas v. Barnhart*, 2004 WL 1529280 (D. Me. June 24, 2004).

Based on the plain language of section 2015(k) of the SNAP Act and the parallel language in § 1382(e)(4)(A)(i) of the Social Security Act, the Court finds that Michigan's Social Welfare Act, Mich. Comp. Laws § 400.10b and DHS' fugitive felon policy, as currently embodied in BEM 204, impose requirements upon applicants for and recipients of food assistance benefits that exceed the requirements imposed by the SNAP Act. Because 7 U.S.C. §§ 2014(b) and 2020(e)(5) expressly prohibit states from imposing additional eligibility requirements, Michigan cannot disqualify a person based solely on the existence of an outstanding felony warrant. That amounts to requiring a person not to

have any outstanding felony warrants to be eligible for SNAP benefits, a requirement that goes beyond the requirements of the SNAP Act. The Court accordingly finds that Mich. Comp. Laws § 400.10b and BEM 204 deprive plaintiffs of their right to food assistance benefits in violation of the SNAP Act.

4.   Preemption

Michigan's fugitive felon law and policy are invalid on a second, independent basis: they are preempted by the SNAP Act.

"Under the Supremacy Clause, U.S. Const., Art. VI,  cl. 2, "state laws that interfere with, or are contrary to the laws of congress, made in pursuance of the constitution are invalid." *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 604 (1991) (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 211, 6 L. Ed. 23 (1824) (Marshall, C.J.)). Preemption "turns principally on congressional intent." *Gibson v. Am. Bankers Ins. Co.*, 289 F.3d 943, 948 (6th Cir. 2002). Such intent may be manifest in an express preemption clause in the relevant statute. *See Chamber of Commerce v. Whiting*, __ U.S. __, 131 S. Ct. 1968, 1977 (2011).

Sections 2014(b) and 2020(e)(5) of the SNAP Act expressly preempt state eligibility requirements that exceed the federal eligibility requirements. *See Kemp v. Medtronic, Inc.*, 231 F.3d 216, 222-23 (6th Cir. 2000) (holding provision of Medical Device Amendments to the Federal Food, Drug, and Cosmetic Act that prohibited states from imposing requirements "different from, or in addition to" federal requirements was express preemption clause). Mich. Comp. Laws § 400.10b and DHS' fugitive felon policy are therefore expressly preempted by federal law.

Defendant argues that plaintiffs' preemption argument fails because it relies on a proposed regulation, 76 Fed. Reg. 51,907. But the proposed regulation is unnecessary to the Court's analysis: as discussed above, the plain language of the SNAP Act alone requires the determinations that (1) the person is fleeing law enforcement, and is doing so with the intent of avoiding prosecution, custody, or confinement, and (2) law enforcement is actively seeking the person. Because Michigan's fugitive felon law and policy do not require these determinations, they effectively impose a requirement beyond what

federal law prescribes.   Michigan's fugitive felon law and policy are therefore preempted by the SNAP Act.

     5.   <u>Conclusion</u>

Under both approaches to the issue – deprivation of rights under the SNAP Act (Count III), or preemption (Count IV) – plaintiffs are entitled to summary judgment.

## V.   Conclusion

Accordingly,

**(1)** Defendant's Motion to Dismiss / Motion for Summary Judgment (Dkt. 81) is GRANTED IN PART, with respect to plaintiff Heather Woodward only.   Woodward's claims are moot and are DISMISSED for lack of subject-matter jurisdiction.   Defendant's motion is DENIED with respect to the remainder of the relief sought;

**(2)** Plaintiffs' Amended Motion to Certify Class (Dkt. 39) is GRANTED.   Pursuant to Federal Rule of Civil Procedure 23(b)(2), the Court certifies the following class and subclass in this action:

**Class**:

All past, present, and future applicants for, or recipients of, benefits administered by the Michigan Department of Human Services (DHS) under the

- Food Assistance Program (FAP)
- Family Independence Program (FIP)
- State Disability Assistance Program (SDA)
- Child Development and Care Program (CDC), and
- Refugee Assistance Program (RAP)

public assistance programs, who have suffered or will suffer actual or threatened denial, termination, or reduction of public assistance benefits based on DHS' determination that the applicant / recipient or a member of the applicant / recipient's household is ineligible based on a criminal justice disqualification, and who receive or have received a written notice at the time of denial issued by DHS informing the applicant / recipient of the criminal justice disqualification.

**Subclass:**

All past, present, and future applicants for, or recipients of, Michigan's Food Assistance Program benefits, who have suffered or will suffer actual or threatened denial, termination, or reduction of Food Assistance Program benefits based on DHS's policy of disqualifying individuals as "fugitive felons," without a finding that the individual is intentionally fleeing from justice to avoid prosecution, or custody or confinement after conviction, and/or without finding that the individual is actively sought by law enforcement, for a crime that is a felony.

The Court names plaintiffs Walter Barry, Donitha Copeland, Westside Mothers, and Kenneth Anderson as class representatives. The Court further appoints Elan Nichols, Jacqueline Doig, Miriam Aukerman, and Sofia Nelson as class counsel.

Plaintiffs are directed to exchange with defendant a proposed notice that will be served upon all members of the class. If the parties agree upon the content and form of the notice, plaintiffs shall submit the notice to the Court no later than February 9, 2015. Otherwise, the parties shall notify the Court and the Court will set a conference for resolution of the dispute;

**(3)** Plaintiffs' Motion for Summary Judgment (Dkt. 49) is GRANTED;

**(4)** It is DECLARED that

(a) Defendant's criminal justice disqualification notices used from December 31, 2012 to present, violate the rights of the individual named plaintiffs and the class members to meaningful notice and an opportunity to be heard under the Fourteenth Amendment to the U.S. Constitution,

(b)    Defendant's criminal justice disqualification notices violate the rights of the individual named plaintiffs and the subclass members to notice under 7 U.S.C. § 2020(e)(10), as implemented by 7 C.F.R. §§ 273.10(g) and 273.13(a),

(c)    Defendant's fugitive felon policy, and the portions of Mich. Comp. Laws §§ 400.10b and 10c on which the policy is based, violate plaintiffs' and subclass members' rights to food assistance benefits under 7 U.S.C. § 2014(a), by imposing eligibility requirements that exceed those under federal law, in violation of 7 U.S.C. §§ 2014(b) and 2020(e)(5),

(d)    Pursuant to U.S. Const. Art. VI, cl. 2, defendant's fugitive felon policy, and the portions of Mich. Comp. Laws §§ 400.10b and 10c on which the policy is based, are preempted by 7 U.S.C. §§ 2014(b), 2015(k), and 2020(e)(5), and implementing regulations;

(5)    Defendant is PERMANENTLY ENJOINED from:

(a)    Denying, reducing, or terminating public assistance, including assistance under the Food Assistance Program, Family Independence Program, State Disability Assistance

94

Program, Child Development and Care Program, and Refugee Assistance Program, without first providing notice that explains, in detail:

1. The nature of the intended action and its duration;

2. The factual and legal bases for the action, including:

   a. which type of criminal justice disqualification (e.g., fugitive felon status) is at issue,

   b. the name of the person whose alleged conduct has resulted in the disqualification,

   c. the date of the relevant warrant or conviction, as well as any other identifying information, including but not limited to a warrant number, case number, or National Crime Information Center number,

   d. the jurisdiction where the conviction occurred or the warrant was issued,

   e. the name of a specific person or entity with knowledge of the basis for the disqualification

95

whom the individual can contact for additional information,

f.  where applicable, a statement that, in accordance with the Food and Nutrition Act of 2008, 7 U.S.C. § 2015(k), defendant has determined that (i) the disqualified individual is fleeing to avoid prosecution, arrest, or custody or confinement for a felony, and (ii) law enforcement is actively seeking the individual; and

3.  the specific actions a disqualified individual can  to obtain resolution of the disqualification and full access to benefits,

(b)  Automatically disqualifying plaintiffs and subclass members from receiving food assistance benefits based solely on an outstanding felony warrant, without determining that the person is intentionally fleeing to avoid prosecution, custody, or confinement after conviction, and that law enforcement officials are actively seeking the person; and

**(6)**   It is further ORDERED that, pursuant to 42 U.S.C. § 1988, plaintiffs are entitled to reasonable attorney's fees and costs.  Plaintiffs are directed to follow the requirements in E.D. Mich. L.R. 54.1 and 54.1.2 for obtaining costs and attorney's fees.

IT IS SO ORDERED.

Dated: January 9, 2015                    /s/Judith E. Levy
Ann Arbor, Michigan                       JUDITH E. LEVY
                                          United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 9, 2015.

                                          /s/Felicia M. Moses
                                          FELICIA M. MOSES
                                          Case Manager